**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 24-444-1** |
| **LARRY LEONARD** | : | |

**GOVERNMENT'S CHANGE OF PLEA MEMORANDUM**

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and S. Chandler Harris and Eric D. Gill, Assistant United States Attorneys, respectfully submits this change of plea memorandum.

## I. BACKGROUND

On December 12, 2024, defendant Nathaniel Leonard was charged by indictment with conspiracy to transport and sell stolen goods in interstate commerce, in violation of 18 U.S.C. § 371 (Count One), interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (Count Two), and money laundering in violation of 18 U.S.C. § 1957 (Counts Three through Five), and aiding and abetting the same in violation of 18 U.S.C. § 2. The charges arise from the defendant's participation in a conspiracy to purchase large amounts of stolen retail merchandise through pawn shops collectively owned and operated by defendant Leonard and his charged coconspirator, Nat Leonard, two of which were located in Philadelphia, Pennsylvania and another which was located in Wilmington, Delaware. The stolen retail merchandise was purchased by pawn shop employees at those locations at the direction of defendant Leonard and co-defendant Nat Leonard, and then transported to the pawn shop operated by the defendant, Pawn Shop No. 2 located on South Street in Philadelphia. At the defendant and co-defendant's

direction, Pawn Shop No. 2 employees would regularly unload the stolen items, list the items for sale on Pawn Shop No. 2's eBay storefront, and then ship the stolen goods in interstate commerce.

The government and the defendant have executed a guilty plea agreement, through which the defendant has agreed to plead guilty to all counts in which he is charged in the indictment. A copy of the signed plea agreement has separately been provided to Chambers. A change of plea hearing is currently scheduled for May 11, 2026.

## II. ELEMENTS

To establish that the defendant conspired to transport and sell stolen goods in interstate commerce, the government must prove beyond a reasonable doubt the following elements:

1. Two or more persons agreed to commit interstate transportation of stolen property or sale of stolen goods that travelled in interstate commerce;

2. The defendant was a party to member of that agreement;

3. The defendant joined the agreement or conspiracy knowing of its objective and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit interstate transportation or sale of stolen property; and

4. At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

To establish that the defendant transported stolen goods in interstate commerce, the government must prove beyond a reasonable doubt the following elements:

1. The defendant transported in interstate commerce items of stolen property as described in the indictment;

2. At the time of such transportation, the defendant knew that the property had been stolen; and

3. The items had a value of $5,000 or more.[1]

To establish that the defendant engaged in money laundering, the government must prove beyond a reasonable doubt the following elements:

1. The defendant engaged or attempted to engage in monetary transaction;
2. That defendant knew the transaction involved criminally derived property;
3. The property had a value greater than $10,000;
4. The property was derived from the sale or transportation of stolen goods in interstate commerce; and
5. The transaction occurred in the United States.

## III. <u>STATUTORY MAXIMUM SENTENCES</u>

The total statutory maximum sentence for the defendant's conviction on Count One for conspiracy is 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and

---

[1] The $5,000 threshold can be met by aggregating multiple shipments, provided the shipments are part of the same scheme, as they are here. *See Schaffer v. United States*, 362 U.S. 511, 517–18, 80 S. Ct. 945, 949, 4 L. Ed. 2d 921 (1960). In *Shaffer*, the Supreme Court reasoned:

> Petitioners also contend that, since the individual shipments with which they were connected amounted to less than $5,000 each, the requirements of the statute as to value were not present. However, it appeared at the trial that the total merchandise shipped to each petitioner during the period charged in the several counts was over $5,000, even though each individual shipment was less. The trial court permitted the aggregation of the value of these shipments to meet the statutory limit, and it is this that is claimed to be error. A sensible reading of the statute properly attributes to Congress the view that where the shipments have enough relationship so that they may properly be charged as a single offense, their value may be aggregated. The Act defines 'value' in terms of that aggregate. The legislative history makes clear that the value may be computed on a 'series of transactions.' It seems plain that the Stracuzzas and each of the petitioners were engaged in a series of transactions, and therefore there is no error on that phase of the case.

*Id.*; *accord United States v. Martin*, 800 F.2d 560, 562 (6th Cir. 1986) (finding it was proper to aggregate the value of a $3,500 check and a $3,000 check as part of the same scheme to defraud in the span of 8 days).

a $100 special assessment.

The total statutory maximum sentence for the defendant's conviction on Count Two for interstate transportation of stolen property is 10 years' imprisonment, a $250,000 fine, a three-year term of supervised release, and a $100 special assessment.

The total statutory maximum sentence for each of the defendant's convictions on Counts Three through Five for money laundering, is 10 years' imprisonment, a term of supervised release of 3 years, a fine of $250,000 or twice the amount of the criminally derived property involved in the transaction, and a special assessment of $100.

Therefore, the total the total permissible statutory maximum sentence is a term of imprisonment of 45 years, a term of supervised release of 3 years, a fine of $1,250,000 or twice the amount of the criminally derived property, and a special assessment of $500.

Restitution as determined by the Court shall be ordered. Forfeiture of an amount to be determined by the Court also may be ordered.

## IV. FACTUAL BASIS FOR THE PLEA

If this case were to proceed to trial, the government would be able to prove each element of the charged offense through agent and witness testimony, video and audio recordings, video and photographic surveillance, and documentary and physical evidence. In summary, the government would prove the facts set forth below.

### A. The Pawn Shops and the Conspirators

The evidence would show that Pawn Shop No. 1 was a business located in the Kensington section of Philadelphia, which held itself out as a pawn shop. Despite having "pawnbrokers" in its name, despite advertising itself as "Philadelphia's Premier Pawnshop since 1987," and despite having received a pawn license on or about December 25, 2004, Pawn Shop

#1 has not been licensed as a pawnshop with the city of Philadelphia since on or about February 28, 2020. Defendant Leonard ran, supervised, and was otherwise responsible for the daily operations of Pawn Shop No. 1.

Pawn Shop No. 2 was a business located on South Street, in Philadelphia, which held itself out as a pawnshop. Despite holding itself out as a pawnshop and despite having received a pawn license on or about April 22, 2014, Pawn Shop No. 2 has not been licensed as a pawnshop with the city of Philadelphia since on or about April 28, 2019. Co-defendant Nat Leonard ran, supervised, and was otherwise responsible for the daily operations of Pawn Shop No. 2.

Pawn Shop No. 3 was a business located in Wilmington, Delaware, which was a licensed pawn shop under Delaware state law. Defendant Leonard oversaw the operation of Pawn Shop No. 3 including through the pawn shop's manager, charged elsewhere.

Delaware state law and Philadelphia County law required pawn shops to be licensed, and both required licensed pawn shops to use an electronic reporting system – which can be accessed by law enforcement – to record every piece of merchandise they purchase from customers. At the time of this indictment, both Delaware and Philadelphia required pawn shops to report their purchases through the LeadsOnline system ("LEADS").

**B. <u>The Scheme</u>**

The government's trial evidence would establish that employees of Pawn Shops Nos. 1-3, along with others and operating at the direction of defendant Leonard and co-defendant Nat Leonard, used the epidemic of opioid and drug addiction in the Eastern District of Pennsylvania, the District of Delaware, and elsewhere, to manipulate drug addicts to obtain quick and easy access to cash with which to help feed their drug dependencies. Testimony and other evidence would show that drug addicts and other serial retail shoplifters (known colloquially as

"boosters") collectively stole millions of dollars of new retail merchandise from Philadelphia and Delaware retailers, including from The Home Depot, Lowe's, Target, Walmart, Best Buy, CVS, Rite Aid, Safeway, and others, which these individuals then sold to pawn shops across the region for cash, including Pawn Shop No. 1, No. 2, and No. 3 (collectively, the "Pawn Shops"). The government's evidence at trial would also show that along with purchasing stolen goods from drugs addicts and "boosters," employees of the Pawn Shops, working at the direction of defendant Leonard and co-defendant Nat Leonard, separately purchased significant quantities of stolen, new, in-box goods from certain individuals operating in a professional nation-wide theft scheme, which also targeted big box stores. These individuals were referred to as "mooks."

Witness and agent testimony, business records, audio and video recordings, and evidence uncovered from federal search warrants executed on the Pawn Shops would establish that from at least on or about April 2020 and continuing through at least on or about December 2023, the vast majority of the Pawn Shops' inventory came from the purchase of stolen merchandise from drug addicts/"boosters" or the "mooks."

The evidence would further show that the stolen items were ultimately sold through Pawn Shop No. 2's eBay site.

Pawn Shop No. 2 operated an online eBay account. This eBay site sold the same type of new, in-box merchandise offered for sale by legitimate area retailers – including power tools, personal electronics, computer equipment, and Lego building sets – except that the eBay site sold this merchandise for prices significantly below the prices offered by legitimate retailers. From in or about January 2019 to in or about November 2023, the conspirators' eBay site generated approximately $19,000,000 in sales.

C. **The Defendant's Role in the Conspiracy**

Witness and agent testimony, audio and video recordings, documentary and business records, and physical evidence seized pursuant to search warrants would establish that defendant Leonard, in accord with co-defendant Nat Leonard, and other employees of the Pawn Shops (some of whom have been charged elsewhere), knowingly purchased and assisted in the purchase of new, in-box, stolen retail merchandise that the Pawn Shops would purchase in cash for a fraction of the merchandise's legitimate retail value. Defendant Leonard's role in the scheme consisted of running day-to-day operations at Pawn Shops No. 1 and 3 and directing the conspiracy. Testimonial evidence would establish that Pawn Shop Nos. 1 and 3 would regularly and routinely purchase merchandise stolen from large big-box retailers that was new and in-box. This stolen merchandise included vacuums, tools, electronic kitchen appliances, personal electronics, Legos and many other items. The defendant and his co-conspirators would buy this stolen merchandise from "booster" and drug addicts, paying them cash for the items. The defendant transported this stolen merchandise from Pawn Shops 1 and 3 in his own car, which was often completely filled, to Pawn Shop 2. On occasion, the defendant made multiple trips in a day to transport the stolen items.

At Pawn Shop 1, the defendant and his co-conspirators also bought stolen items from a separate source: a group of professional thieves that the defendant and others referred to as "mooks." The "mooks" traveled across the country stealing high-end consumer electronics, cameras and other valuable merchandise from retailers such as the Home Depot, Lowe's, Target, Walmart, Best Buy, CVS, Rite Aid, Safeway, and others. The defendant and his co-conspirators bought these items for cash. And, like the stolen merchandize bought from the "boosters" or drug

addicts, the defendant transported this stolen merchandise in his own car, again often completely filled, to Pawn Shop 2.

Pawn Shop 2 primarily served as the coordination and distribution point for stolen retail items purchased at Pawn Shops No. 1 and 3. Once the items arrived at Pawn Shop No. 2, the items were unloaded by Pawn Shop No. 2 employees, including defendant Leonard and occasionally his co-defendant Nat Leonard. The items were subsequently listed for sale via Pawn Shop No. 2's eBay storefront, or sold directly to another stolen item "wholesaler," at prices significantly below their retail value.

The evidence would show, as outlined in Overt Acts 2-3, 6-7 that defendant Leonard and co-defendant Nat Leonard, would regularly communicate to coordinate the pickup and transportation of new in-box stolen goods from Pawn Shops No. 1 and 3. Evidence would also show, as outlined in Overt Acts 4, 8-10, 13, 16, 17 and 20 that defendant Leonard and his co-conspirators bought stolen items from then "mooks" and then transported that merchandise to Pawn Shop 2. Evidence would also show, as outlined in Overt Acts 9, 14, and 21 that defendant Leonard, co-defendant Nat Leonard and Pawn Shop No. 2 employees sold hundreds of stolen new in-box items to other stolen item "wholesalers," who similarly listed the items for sale via online storefronts.

As indicated in Overt Act 22, witness and agent testimony and photographic evidence, and surveillance evidence would establish that on a routine if not daily basis, defendant Leonard, co-defendant Nat Leonard, and other employees of the Pawn Shops would load vehicles with the stolen retail merchandise purchased from boosters or mooks at Pawn Shop No. 1 and No. 3, and then defendant Leonard transported the stolen merchandise to Pawn Shop No. 2 in Philadelphia, Pennsylvania. Evidence would also establish that the aggregate value of stolen items purchased

at Pawn Shop No. 3, located in Wilmington, Delaware, and subsequently transported across state lines to Pennsylvania, exceeded $5,000.

Finally, agent and witness testimony along with bank and financial records would establish that on December 16, 2022, January 17, 2023, and April 17, 2023, the defendant engaged in monetary transactions in criminally derived proceeds greater than $10,000 by using his illegal proceeds to pay off three American Express credit card bills, as charged in Counts Three through Five of the indictment.

## V. GUILTY PLEA AGREEMENT

The parties have executed a plea agreement, that will be presented to the Court during a hearing regarding entry of the guilty plea. The agreement includes a supplement to be filed under seal.

The plea agreement contains the defendant's agreement to plead guilty to all counts charged against him in the indictment (Counts One through Five). Its essential terms include the parties agreement that the fraud loss in this case is no less than $9,500,000, which corresponds to at least a 20-level increase in the defendant's guidelines under USSG § 2B1.1(b)(1)(K). The government reserves the right to present additional evidence at sentencing that the loss is greater than $25,000,000. The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a), as well as 1-level downward adjustment under USSG § 3E1.1(b), if these provisions are warranted under the guidelines.

The plea agreement contains the standard appellate waiver terms, which severely limit the defendant's avenues for an appeal. The parties also agreed that the defendant will be

responsible for restitution and forfeiture in an amount to be determined by the Court at sentencing.

## VI. CONCLUSION

The United States respectfully submits that this summary of evidence provides a factual basis for a guilty plea by the defendant to Count One through Five of the indictment. The government therefore respectfully requests that the Court find that the defendant's guilty plea is being tendered to the Court voluntarily, knowingly, and intelligently, and is supported by the requisite factual basis.

Respectfully submitted,

DAVID METCALF
United States Attorney

*s/ Eric D. Gill*
ERIC D. GILL
S. CHANDLER HARRIS
Assistant United States Attorneys

Dated: May 8, 2026